The court has allotted 40 minutes per side for this argument. I think what we're going to do, we've been allotted a total of 40 minutes for these four consolidated cases. I think the goal here is to probably go about 20 in our opening remarks. I'll go about 15. Mr. Kindley, who represents Grace Harbor, will go five, and then we'll reserve the balance of our time as needed for rebuttal questions. Let me start by telling you what you have before you here, because you've consolidated a number of cases and try to put these into perspective. You have four cases now consolidated. The first and most important of those four is the case that deals with the amendments to the subscription contracts that are the subject of the case just submitted. So what happened was those were 10-year agreements, and then those agreements were modified in 2004 for the out years of the remaining five years. So there's a 2-4-0. I'm looking at our docket number, trying to figure out which one is the most important. I apologize for not bringing the docket numbers up with me, but I'll rebuttal. Is that the challenge to the May 24, 2004 contract amendments? Is that the one? Yes, it is. Let me start with a couple of overviews. The first one is that to the extent that you were to find the underlying subscription contracts void, that would have the effect of voiding all of the contracts in the four cases that are now subject before you, because there would be a failure of consideration. They're all amendments or contracts that grow out of the original agreement. So that's an initial point of clarification. Second, I think that the Court's questioning in the preceding case is relevant. I want to add an overview thought before I get to the specific substance of the argument, and that is when you're thinking about the Northwest Power Act, which is a legislative compromise, it has really two related and important components. There's a piece of it in 5C that says this is how we calculate the benefits that are paid to the IOUs, and there's a recipe there. And that recipe, what's in the statute, which talks about average system costs and exchange in power calculated in a certain particular way, bears no relationship at all to the settlement that was ultimately achieved. The only thing that's the same is both involve money, but the methodology is completely different. But 5C is the part of the statute that talks about how much do the IOUs get. But that's only half of the statute, and what's important is there's a legislative compromise in the statute. And the legislative compromise is that the rates paid by the public utilities will not be higher than they would have been if the Northwest Power Act did not exist. That was the compromise. That's what it took to get the public power utilities on board to support that legislation. So there's a balance that's established in the Act. And where was that money going to come from? Because if it can't come from the PUDs, from the preference customers, it has to come from somebody else. Is it going to come from the DSIs? In the original conception of the Act, it was going to come from the DSIs. What has complicated matters over time is that the DSIs are relatively not a factor now. So basically, the way this works now is when the cap, the ceiling is triggered under 7B2, then under 7B3, you have to surcharge all other rates. There's really only one other rate. It's the rate that belongs to the IOUs. So what's wrong with these contracts from a technical standpoint is they disable the ability to surcharge. Because if you look at paragraph 4C of the subscription contracts and also that provision as it's carried forward into the amendments, what it says is that for the next five years, no matter what happens, the rates that the IOUs pay will never be higher than the lowest preference rate, which is the low rate. So what they've done is with the only other rate class that's available to pay the surcharge, they've locked it down so that effectively they've done away with the 7B3 surcharge. That's the technical problem with the contract. Here's the additional point, though, that I wanted to make about 7B2. You were asking questions about were the numbers within the range of the settlement. Right? So the notion is in BPA's business judgment, if it's got a low number and a high number, why can't it settle in the middle? And there are really two parts to the answer to that question. The first is that in the earlier case, the 7B2 rate test had triggered because that matter had been adjudicated. So it was done. And now in this rate period, we're talking now about the amendments, it triggered at 48 million in the underlying contracts. In the amendments, last week a notice was published in the Federal Register that, consistent with what we predicted in our briefs, triggered at, I believe, at zero. And we've submitted that this morning with a supplemental letter so that the Court has it if it chooses. So here is the sort of underlying philosophical question. When you talk about settling residential exchange benefits, it would be one thing to say, well, we're just going to compromise claims under 5C. So the IOUs think that they're owed X and Bonneville thinks they're owed Y and it's a complicated process. Why can't they work that out? But that's an overly simplistic analysis and it's what's wrong with the whole system of what's taken place here. The statute in the second half, the first half, 5C, creates rights that belong, that talk about how do the IOUs get paid, what's the methodology. But the second half of the statute, 7B2, 7B3, say how are those costs to be imposed. So there's both a mechanism to calculate benefits, but there's also a part of the statute that says in what way are those costs going to be imposed. And what 7B2 and 7B3 say is that once the rate test triggers, that cuts it off. And what if BPA was wrong in deciding in this earlier adjudication that the 7B2 test was triggered at $48 million? Is it possible that they were wrong? It is possible. And what if they were wrong? It's a great question and it's exactly where I was headed, Your Honor. And was that being litigated against them at the time they entered into the settlement? Excuse me, let me finish the question. Was that being litigated against them, that is to say whether $48 million was the trigger for 7B2, was that being litigated against them at the time they entered into the settlement agreements? Not to my understanding as a non-participant in the proceedings. My understanding was that they disputed it, but there wasn't a pending matter. But I may not be correct about that. But here is the critical point, Your Honor. How can you settle? Their notion is, well, we're going to compromise 7B2. It could be this, it could be that. We're going to compromise 7B2. The 7B2 rights don't belong to the IOUs. They belong to the public power utilities. That's what the problem is. If you're going to settle and say we're going to reach an accommodation on what the rate ceiling is, we're not going to adjudicate it, we're going to settle it, you have to bring to the table the parties that own those claims. Every single public power utility in the region filed in the underlying case. None of them were brought to the table. That's why if you read some of the later records of decision in this case, Bonneville has come back and tried to say we want to do a global settlement. We'll talk about that perhaps more in a few minutes. But in 2003, Bonneville tried to... The cap certainly affects the IOUs. It's not like the IOUs wouldn't have standing to claim that a 702 calculation, a 7B2 calculation wasn't correct. I fully agree with that, Your Honor. Absolutely. Well, then it's not, it's only partially correct to say that the rights don't belong to the IOUs. I think it would be more accurate, wouldn't it, to say that they belong both to the IOUs and affect the PUDs? That is a fair and accurate observation, Your Honor. Absolutely. The point, though, I think remains, and I think this thing could be settled. There is a dispute as to what the cap is. Was this dispute ongoing during this period? And how do we know whether there's a violation of 7B2 if there's a dispute over what the cap is? Well, in the underlying rate, in the underlying rate case in the current, now current rate period, there was an adjudication that determined it to be $48 million. And I believe that there was an appeal until recently. An adjudication? I think we're aware of that at Bonneville. So this is a BPA, this is a BPA calculation for the $48 million? Yes. Was there an appeal to this court? That is my understanding. And then it was just dismissed approximately a week ago. It was just dismissed when? About a week ago. A week ago? A week or two ago. That's my understanding. That rate didn't have to be approved by FERC or anybody else. It would come straight from BPA to this court. Is that correct? I believe that it did have to be approved, Your Honor, but I have to confess that there are people in this courtroom far more able than I to answer that more technical question about the rate setting. So at the time then when the settlement agreements were entered into, this $48 million trigger obviously was still up in the air if it was dismissed, if the petition to us was dismissed only a week ago. Well, it had been determined subject to appeal. Right. But, of course, sometimes things get changed when they're on appeal. Certainly. So BPA could have thought that the $48 million was the number they'd arrived at, but it might get radically revised as a possibility? Yes. I think, though, that when you wrap up the discussion of a settlement, right, so they have that appeal pending, there's a dispute about that issue, I think our position is that you can't settle that dispute because it implicates the rights of others besides BPA. Well, if you can't settle a dispute, how do you know what the ceiling is? They have to set – they have to enter into a settlement. And one of the factors is that it can't exceed a certain amount because it's a trigger. Okay. Now, there's a dispute over what that cap is. What do you do? Do you have to wait to enter into a settlement till the dispute gets exhausted in the courts? Or do you take a guess? And then if you guess wrong, then the rate was – then the settlement is wrong. Maybe is it – can you only tell whether the settlement was improper after last week when we know what the cap actually is? Well, what happened in these contracts – keep in mind the 7B2 issue is a primarily rate issue. What happened in the contracts is that while the law was that it was $48 million, that was the cap. And with full knowledge of that, BPA, with the wrongful understanding that its settlement authority allowed it to go outside of that, contracted to pay $140 million. But if last week we had said, no, $48 billion or a million was not the actual cap, it was $200, then the settlement that you're now attacking might have been all right. That would potentially relieve the settlement. But our view still would be that – So the settlement was really uncertain as to its legality until last week's case was decided. Your Honor, I'm going to – because that involves a fairly complicated rate-related issue, I'm going to defer responding to that because I want to be accurate. Let me ask a question that I don't think you need to defer, although maybe. But it sounds to me that now your argument is not – I'm not asking you to waive your argument about the settlement authority and whether it's within the range of the RAPs and so on. But now it sounds to me as though your argument about settlement is it's almost like due process. They had to include us in the settlement discussions, and they didn't. I think that's part of it. But what we're saying here is that Congress set forth with no gap to fill under Chevron and MSR specific requirements for how the benefits would be paid and specifically at what level cost protections would kick in. And what EPA has said here as a legal matter, and it's wrong, is that its settlement authority allows it to trump those protections. Well, that's not the argument they're making today. It seems to me they disavowed that argument. They were saying that they were not saying they could disregard either of those sections. They were saying that the settlement complies fully with both those sections. That's not the way I understood the argument. Well, our understanding from the records of decision and the way they briefed this case was that their ability to do what they did here depended wholly on their interpretation of their powers under 2F. And what they say repeatedly in their briefs is we have not construed our authority under Section 5C or interpreted. That's not what we've done. What we've done here is interpreted our authority under 2F. So the narrow legal question that we think is presented by this appeal is, does BPA's 2F authority allow it to, A, completely get rid of the methodology that's in the Northwest Power Act? I must say, I thought coming into the argument that that seemed to be an issue in the case. The significant issue was whether the settlement authority was such as to allow them to disregard certain provisions of either of the five or seven. From listening to the argument this morning, it does not seem to me that that's their position at all, that their position is if there was no deviation from Section 5 or from 7, whether it's 2B7 or whatever, that they complied fully with both. That's different from what you describe as the legal issue and different from what I had thought was a significant legal issue. And our position certainly is that they did not comply with Section 5C because Section 5, I mean, they don't even say they do. Their briefing says we offered benefits to the IOUs in one of two separate forms. You could either get yourself a traditional residential exchange contract. That was one choice. But those were capped at the $48 million, which they acknowledged, or you could enter into a, quote, settlement agreement and get $140 million because then magically the 72 rate protections didn't apply. And they said they could do that solely because of their 2F settlement authority. We're settling a dispute so we can offer a number significantly in excess of what we know we can offer under the residential exchange. And that is wholly dependent on their 2F power because there's certainly nothing in the Act under 5C that allows them to simply rewrite what 5C says. Now, I'm reading from these briefs which are somewhat redundant. I'm kind of sympathetic because you weren't sure how they're going to be consolidated. So I'm reading from the BPA brief in Portland General, the case argued before, and just reading from their summary of argument, I'm on page 14. I don't think you need to turn to it. But the BPA is saying, as discussed in the detail below, the IOUs claims and disputes regarding the RAP, the residential exchange program, for fiscal year 2002-2006 period were substantial, return about the ASC methodology, three bullet points. BPA, this is now past the bullet points, offered RAP settlement agreements that it forecasted to cost $140 million per year to settle claims substantially in excess of $300 million per year. In other words, I hear them, I read them as saying there that the claims against us by the IOUs under the RAP program, if entirely successful, would reach $300 million. We gave them $140. They're not saying that 2F allows us to go outside of any reasonable scope of what we might lose if we lost all of these disputes under the RAP. Am I misunderstanding their brief? Well, hey, that's the argument. I think Your Honor's accurately told us the argument. So then in order to evaluate their argument, we've got to get a fix on, where does that $300 million number come from that they say, well, that was the outer boundary of our liability if the IOUs turned out to be right on the RAPs? Because if they're right, that $300 million is the outer boundary of what they could have been liable to in all of those disputes about RAPs, and they're just coughing up $140. Well, it sounds like they're in the clear. I think the answer to that, Your Honor, has several parts to it. First is, in the subscription case, the rate test had triggered. Then they entered into a separate contract that ignored what the rate test at that time did. So I think our view would be that while the rate test is triggered at $48 million, they're capped at $48 million. If they change that later, so the ---- But even if that rate cap is under litigation, it might not hold up. Right. And then that's our ---- They can't settle based upon a contingency. Well, you know, we might lose this on appeal. Well, then, if you're going to go to that step, then I think the answer comes in two parts. The first is what I said before, which is if they're going to settle that claim, so and implicit in that is they're going to decide what 7B2 looks like. This was a question you didn't want to answer. I thought that you were going to defer. What happens if the ---- It's unclear at the time what the cap's going to be because there's a dispute over it. If you enter into a settlement, then does that mean that you don't know whether it's a valid settlement until the cap is finally determined? You were going to defer that to your colleague. And I think that's still a wise choice. Let me talk just very briefly about the litigation penalty aspect of this case. It's been briefed, as the Court knows. We appealed from BPA's attempt to implement the litigation penalty. This is the $200 million charge that arises out of the buyback agreements. We appealed it when BPA in its 2003 settlement rod said if the cases don't settle, we're going to impose that payment. That's the first of the litigation penalty cases. We appealed it a second time when the settlement failed, and BPA issued a press release that said there's no more decision-making to be done here. Now we're going to impose the payment. And we appealed it yet a third time because it's embedded inside these contract amendments. Without belaboring the litigation penalty, the problem is this. Bonneville abuses its discretion to conduct its business affairs when it enters into agreements or makes decisions with the specific intent to coerce parties to dismiss their litigation. If you go back and look at the provision that's in those buyback agreements, there's a $7 layer in the buyback price between $38 and $45. And that $7 is wholly dependent on whether the cases settle or not. And we have submitted evidence that shows that the intent of that provision at the time was to coerce the public power utilities to dismiss the cases. But the figure that the IOUs were going to receive was $45 unless they settled? Well, that's in dispute. They tried to craft the agreements that way. But if you look at that, you just admitted two documents in this case in our motion to supplement. One of them is a memo or a letter that was submitted by one of the attorneys for the IOUs. And it's fast in terms of it starts at $38 and it bounces up. So the $7 comes from the difference between $45 and $38. Yes. Okay. What figure do the IOUs start with unless they can settle this? Well, their view of the world is they start at $48, and if the contingency is satisfied, it drops to $38. Okay. But that's money that they're getting, right? Is that the sale price? Oh, it looks like it's going in the wrong direction. I'm missing something here. Okay. It looks like if they succeed in settling it, they get less money than if they didn't settle it. That's right. Well, why would they want to do that? Well, what they were trying to do was create an environment. Let me back up. By the time these buybacks happen, there's a zillion challenges to the subscription contracts that we just talked about. And then the BPA finds itself kind of wrapped around the axle because it sold a bunch of power to the IOUs. Now the Western power market's gone way up. Now it's got to try to buy that power back. So they're vulnerable. And in that discussion, they agree with the IOUs, two of them, the two Pacific Corp and Puget Sound Energy, let's put a provision in the contract that says that you get one number if the litigation doesn't go away, but you get a different number if the litigation does go away, a lower number. Right. But that works. I think now I understand your question. That backs its way through as a rate benefit to the public. In other words, if BPA pays the IOUs a higher number, $200 million more, 45 is $200 million more than 38, that $200 million only has one place to come from, and that's to go back and surcharge all the rates for that amount. So it's a financial incentive to settle. So the incentive, the true financial incentive then in going from $45 per megawatt to the $38 figure per megawatt was not to the IOUs who were entering into these settlements. It's inducement to the PUDs to agree with the IOUs to settle all of this globally. Fundamentally, that's correct. And what we're submitting to the court is that that was done intentionally to try to coerce, at a time of extraordinary rate pressure, the public utilities to dismiss their underlying claims to the settlement contracts. Is it coercion to the PUDs if BPA had approached them directly and said, look, what's it going to take to settle this case? We'll back off of our – we'll give you a beneficial rate here, or we'll give you a cash settlement to construct it any way you want if you'll settle your litigation. Now, that's not coercion, is it? It really depends on the intent. And what happens here is factually different than that. I understand the court's question. I think in the abstract, if BPA said we put a deal together and here's what happens, maybe that works. But here, at the time that these penalty payments were entered into, the specific intent by BPA was to use them in a coercive fashion, both sides to that agreement. But it sounds like any sort of coercion inherent in any settlement offer, here it is, if you keep litigating, the settlement office is off the table. Well. It'll cost you 200 million bucks that is here on the table for you to settle now. If you don't settle, you lose it. But BPA as a government agency should not be taking actions. BPA should not be taking actions as a part of its business authority, which is designed to get parties to dismiss claims against BPA. That's what we're saying. Because that's a government entity taking steps to show a party's right to petition government. Well, I think it might depend on the, you know, how it worked economically. If you had legitimate claims for 200 million, say, and they said, okay, if you don't drop those claims, we're going to impose another $200 million charge against you, which we otherwise wouldn't. That might be one thing. If they were going to say, well, if it were going to be legitimate, which is what you say, it depends on motive. If they had a legitimate business reason to impose a different charge to the private companies, if there were no settlement, then it would not be coercive. Whether it's coercive would depend, in your view, on what the motive is. And how do you determine that? Well, we know because they were willing to take the $38 lower price if the litigation went away, and the higher price if it didn't. So the $7 isn't a power purchase. It's a layer. It totals $200 million, and it is solely, only, specifically for the purpose of inducing the public utilities to dismiss their claims, because if they don't, they're going to have to absorb this $200 million. Right. The $7 marginal difference between $38 and $45 on a per-megawatt basis was money that would be passed along in cost to the PUDs, right? Because this is money that's going to be paid out to the IOUs. Yes. But if it's the zero-sum game, if it's paid out to the IOUs, then it's coming out of the pocket of the PUDs. What BPA has effectively said is, IOUs, if you don't settle this, you're going to get $45 per megawatt. If you do settle it, you're going to get $38 per megawatt, which sounds like it would be ridiculous for the PUDs to take as a settlement. Why would they take less money? Well, the reason was because they get rid of the litigation. That $7 is almost the same as if BPA had gone to the PUDs and said, we'll give you $7 a megawatt if you'll settle this litigation. Now, what would be wrong with that? Why would that be coercive? This is like a different kind of step transaction, but that looks like what they're doing, doesn't it? Well, again, in the particular circumstances of this case, what they did was, instead of dealing directly with the public utilities, they went to the IOUs and they gave the IOUs a settlement hammer that they shouldn't provide it to them because they essentially delegated. The settlements, the way those provisions are structured, they say if Pacific Corp. is satisfied with its settlement with one or more. So what they did was they enabled Pacific Corp. and Puget Sound Energy to go out to the other parties and say, settle with us or else, and dictate the terms. And I think that the difference in the court's hypothetical is that here, what BPA did was improperly provided this hammer, if you will, a coercive mechanism to these two large IOUs to increase their negotiating position relatively. But your argument as to why this is wrong is essentially a First Amendment petition for grievances argument. Yes. But if you're right on that argument, it sounds to me as though the government will be tremendously limited in any ordinary lawsuit and a suit against the government in offering settlements. When it says, well, listen, okay, I understand you're going to claim against me for a million dollars for whatever it is under the Federal Proclaims Act. Well, I'm willing to offer you $500,000, half of that if you drop it now. And if you don't, well, I'm offering you nothing and you may lose. Why is that not coercive in the same way this is coercive? Well, I think there's a difference between that scenario where the government's trying to settle a lawsuit versus a situation where the government goes to a certain customer base and empowers them by giving them increased settlement leverage to then use against other parties. But whether or not you settle, once they've entered into this agreement that says with this so-called $200 million litigation penalty, it's entirely in the hands of the PUDs. They can say yes or no. There's an offer that's on the table. If they say no, they lose the $200 million. If they say yes, they get it. But the notion here is that Bonneville is charging rates and recovering its costs, not in the business of providing litigation penalties to various parties. Yeah, but if your argument is a First Amendment argument, this one goes so far from me, it's terrifying, as to say it would so limit the ability of the government to offer settlements and suits against it. I don't see how the government could operate in ordinary litigation. Your Honor, I'd like to reserve the last piece. Thank you. Your Honor, my name is Paul Merrick. I represent the Kennedy Utilities Board in one of the cases. Could you speak up, please? Yes. I wanted to address the questions that were asked about the settlement of the rate ceiling protection. Bonneville does the rate ceiling calculation not really for contract purposes. It is a protection to the rates of the public utilities, and therefore it does it when it looks at the rates. It establishes the rates, and by statute, Bonneville may not charge more than the rate ceiling. And it is required by the statute in 7B2 to make the determination as to what the rate ceiling is and keep the rates within that. It had done so. That case is one of the cases that is going to be argued before you Wednesday of this week, and so you'll hear about that at that time. Now, having done that, and it did that, and it completed that process of determining what the rate ceiling was on a final basis for, at least final for Bonneville, as of May of 2000, and it entered into the contracts that were discussed in the earlier case and now amended in the case before you now. In October of 2000. And it had determined that the rate ceiling limited the amounts that could be collected from the public to $48 million. It was an adjudication. But Bonneville did not provide the public utilities that protection. It actually raised the rates substantially above that, as you'll hear later in this week. And the reason it did it is because it concluded that it was going to enter into these settlement agreements, and it took the position that the amounts of money that it was agreeing to settle with the IOUs were not subject to that rate ceiling. So that's why now Bonneville has changed its argument entirely, but the fact of the matter is it made the adjudication. It was $48 million in the facts before it at that time. And then it moved on. It wrote this other contract that basically said, irrespective of the adjudication as to the protection, we must afford the publics, we're going to write a contract which cannot possibly grant them that protection. And that's the contract before you. Now, are you saying then that the representation that we've heard both orally today and I think in the briefs that said, listen, we were exposed in litigation to claims up to $300 million and we settled for $140 million, you're saying that that's a bogus statement, that they in fact were not subject to claims for $300 million if the litigation challenging that $48 million cap and other things had gone forward? I'm not exactly saying it's a bogus statement. What I'm saying is that Bonneville has changed its argument. It claimed in the underlying, it claimed it did not have to afford the publics the protection because it was a settled amount. It did go on, it did say that there was a lot of potential for litigation, but it was required to adjudicate the actual amount prior. It had to do that as part of the rate case. So when it signed the contracts, it had made an adjudication. And then it acted inconsistent with the adjudication. The question that was deferred to you, I guess, and that is to say, okay, so they settle and they adjudicate and they decide that $48 million is the amount at which 72 is triggered. That's challenged, I gather. That has – there was the potential for challenge at that time. Actually, no challenge could actually be filed until 2003 when FERC approved the rates on a final basis. But my point is, it's like law of the case. I have a question, please. So it's subject to challenge. And when FERC approves, is it then actually challenged? It could be challenged, yes. It's subject to challenge. And then when FERC approves it – this is outside the record in front of me, so I'm just trying to figure this out. Did FERC then approve the $48 million? They approved the rates. They don't look at all the individual details. And was that then, at that time, challenged, including a challenge to the $48 million trigger? There were challenges made, and one of the arguments involved that. But that was in a separate case. My point is here, they decided what the protection is. There was no effort to settle with the publics, having adjudicated their rates were capped based upon this $48 million. There was no effort whatsoever to settle with the publics to say, let's settle for a different number. They made an adjudication that the rates were subject to that cap, and they also made an adjudication that because it was a settlement, it wasn't subject to the cap. That's the – I believe what Mr. Cassata is saying is true, that they acted like they were settling within a range that was reasonable, but they really made the determination that the cap – the amounts in the settlement aren't subject to the cap. That's how they got where they got. And that's the error. And do you have a text in which they say exactly that? Because I was looking back through the brief to find out where they said exactly that in the brief, and I couldn't find it. Do you have a text in an ROD where they say we're out from under 7b-2, we're out from under 5c, we're out from under the RAP program when we're entering into these settlement agreements? Do you have a text in an ROD that says that explicitly? It's in the – it's in the brief you'll be looking at. Look at Bonneville's main brief in the GNA versus BPA case, which is where they're looking at how the rates are made, and they say explicitly that because they settled it, it became a 7g cost and it wasn't subject to the cap. That's where they make it. They made it in the rate case, and they made it in the rate – they are making it in the rate case they're doing now. They didn't discuss that issue when they entered into the contract. Which brief is that in? In which case? It's in Bonneville's – it's the GNA versus – there's Golden Northwest Aluminum versus BPA. It's scheduled for oral argument this Wednesday. Wednesday, right. And that is precisely the argument they make. And they're coming in here and they're telling you something a little bit different theory, but the argument always has been that the settlement amounts do not fall within the rate limitation, that just because they settled the number, the published don't get the benefit of the rate limitation. Thank you. If you may please the court, my name is Ray Kimbley, and I'm representing Grace Harbor PUD. Given the time constraints, I'm going to try to keep this to about two or three minutes. And I want to focus on one point I'd like to have the court note today. One is that the amended settlement agreements that Grace Harbor PUD is challenging are the settlement of ROJ record decisions. There were substantial rules under the APA, under Section 552 of the APA. There were rules, as discussed earlier, because the mechanism for the $200 million litigation penalty required the settlement or the dismissal of suits that had been brought by the PUDs. BPA is claiming that basically those rules or the amended settlement agreement ROJ were not substantive rules because it did not involve any other parties besides Pacific Corp and BPA. That's incorrect. For those provisions to operate, public agencies needed to have the ability to settle, in other words, to settle and realize the $200 million benefit. Counsel, I want to make sure I understand. You are representing, and I don't have some materials that didn't arrive by Federal Express this morning, so I'm working off of some other notes. You are representing Grace Harbor in 0470306, is that correct? I'm representing in 04-71185. Oh, you're 11185. Right. This is one of the challenges to BPA's record decisions concerning the amended settlement agreements. Anyway, BPA had not provided any public process for these amended settlement agreements before they executed them. We also had no opportunity after they were executed. BPA's claim is there is no duty to do this, basically because they were not substantive rules under the APA. You challenged in 2004. The decision was in 2001. The only way you are timely is if they were required to publish the ROD. That's correct. Our argument is they failed to comply with Section 552A1 under the Procedures Act. Counsel, we have four consolidated cases here. Let's assume that at least one of those four has been timely and properly filed so that the appeal is before us today. So at least let's just stipulate that one of those four. Is there any substance of the argument that turns on which one of those cases we believe we have jurisdiction to review? You represent a petitioner in 1185. We have 306, 047, and 240. If we were to decide that one of those other cases was timely, is there an argument that we would not consider that you wish to make today? Yes. We made a constitutional argument that basically we made basically due process arguments. The BPA was obligated to publish these things. It didn't do that. We were parties. In essence, we were obligated to settle the agreements in order to receive the benefit of the $200 million. We did not receive notice appropriately during the proper time of the operation of that. Let me start over again. The $200 million litigation penalty order, as BPA refers to it, the discount of risk provision, basically said these energies, Pacific Core and Tucson Energy, needed to enter into settlement agreements with public agencies by 2001, December 1, 2001. For those to operate properly, we actually needed to have settlement. We also actually needed to have knowledge that we could settle during that period and avoid the litigation penalty. BPA did not provide that. These were substantive rules we should have received some notice about. All right. Thank you, counsel. Thank you.
judges: Reinhardt, W. Fletcher, Bybee